# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# HATTIESBURG DIVISION

**DEREK A. HENDERSON, TRUSTEE**                                **APPELLANT**

**V.**                              **CIVIL ACTION NO. 2:11-CV-243-KS-MTP**

**COMMUNITY BANK, ELLISVILLE,**
**MISSISSIPPI, A.K.A. COMMUNITY BANK**                        **APPELLEE**

### MEMORANDUM OPINION AND ORDER

For the reasons stated below, the Court affirms the September 14, 2011, Memorandum Opinion entered by the Bankruptcy Court in this matter.

### I. BACKGROUND[1]

Stinson Petrolum Company, Inc. (the "Debtor") engaged in a substantial check-kiting scheme before filing a voluntary petition under Chapter 11 of the United States Bankruptcy Code on August 4, 2009. In July 2009, the Debtor maintained a checking account with Community Bank (the "CB account") and a checking account with the Bank of Evergreen (the "BOE Account"). These were the accounts associated with the kite.

Bank of Evergreen was closed on Friday, July 3, 3009, because of the Independence Day holiday on Saturday, July 4, 2009. However, Community Bank

---

[1]As the facts in this matter are largely undisputed, the Court's account of its factual and procedural background borrows heavily – both substantively and stylistically – from the Bankruptcy Court's opinion, which provided the facts as stipulated by the parties in the pretrial order. *See In re Stinson Petroleum Co.*, No. 09-05094-NPO, 55 Bankr. Ct. Dec. 129, 2011 Bankr. LEXIS 3511, at *3 (Bankr. S.D. Miss. Sept. 14, 2011).

remained open on July 3, 2009, because the Federal Reserve was open on that day. Before the holiday weekend, Bank of Evergreen vice-president Tim Dantz had become suspicious of kiting activity in the Debtor's BOE account. After Bank of Evergreen reopened on Monday, July 6, 2009, Dantz confirmed that the Debtor had been kiting checks between the BOE Account and the CB Account. Therefore, he placed a five-day hold on $3,940,161.00 deposited in the BOE Account that day and $3,296,600.00 deposited in the BOE Account on Thursday, July 2, 2009. Accordingly, the kite collapsed.

The deposits into the BOE Account on July 2 and July 6, 2009, included the following checks drawn on the CB Account:

| **Check Number** | **Amount** |
|---|---|
| **July 2, 2009** | |
| 1636 | $500,000.00 |
| 1640 | $696,404.00 |
| 1646 | $618,080.00 |
| 1651 | $689,740.00 |
| 1657 | $592,376.00 |
| **July 6, 2009** | |
| 1643 | $505,025.00 |
| 1650 | $806,346.00 |
| 1655 | $818,400.00 |
| 1661 | $673,132.00 |
| 1668 | $887,258.00 |

The deposit made on July 2, 2009, also included a check in the amount of $200,000.00

2

drawn on an account at a different bank, and the deposit made on July 6, 2009, included a check in the amount of $250,000.00 drawn on an account at a different bank.

On Tuesday, July 7, 2009, Bank of Evergreen placed a five-day hold on $2,115,001.00 deposited in the BOE Account, including the following checks drawn on the CB Account:

| Community Bank Check Number | Amount |
|---|---|
| 1644 | $450,000.00 |
| 1652 | $535,219.00 |
| 1658 | $506,780.00 |
| 1665 | $478,002.00 |

The deposit also included a check in the amount of $150,000.00 drawn on an account at a different bank.

Bank of Evergreen placed holds on the funds so that the deposited checks could be processed for forward collection and payment through the Federal Reserve. While the holds were in place, the Debtor did not have access to the funds through the use of provisional credits, and checks that were presented for payment on the BOE Account were rejected for insufficient funds and returned unpaid.

Therefore, over several days beginning on July 6, 2009, Bank of Evergreen refused to honor eighteen (18) checks totaling $10,178,452.00 drawn on the Debtor's BOE Account that the Debtor had deposited into its CB Account. After these checks were deposited in the CB Account, Community Bank processed them for collection and

3

payment, making a digital image of the checks and electronically transmitting them through the Federal Reserve for presentment to Bank of Evergreen. Those checks, their numbers, amounts, and dates were as follows:

| Bank of Evergreen Check Number | Amount | Date of Deposit |
|---|---|---|
| 2226 | $466,770.00 | 6/30/09 |
| 2229 | $745,360.00 | 6/30/09 |
| 2231 | $780,733.00 | 6/30/09 |
| 2237 | $289,600.00 | 7/2/09 |
| 2242 | $414,930.00 | 7/2/09 |
| 2240 | $703,892.00 | 7/2/09 |
| 2243 | $722,683.00 | 7/2/09 |
| 2238 | $310,580.00 | 7/3/09 |
| 2241 | $603,244.00 | 7/3/09 |
| 2234 | $425,000.00 | 7/3/09 |
| 2244 | $706,200.00 | 7/3/09 |
| 2248 | $706,096.00 | 7/3/09 |
| 2235 | $306,988.00 | 7/6/09 |
| 2245 | $347,300.00 | 7/6/09 |
| 2239 | $704,610.00 | 7/6/09 |
| 2247 | $767,014.00 | 7/6/09 |
| 2246 | $340,000.00 | 7/7/09 |
| 2250 | $783,452.00 | 7/7/09 |

Community Bank provided the Debtor with provisional credit for each of these uncollected deposits, and the Debtor availed itself of those provisional credits.

According to the electronic endorsements, the three Bank of Evergreen checks deposited into the CB Account on Tuesday, June 30, 2009, (check nos. 2226, 2229, and 2231) were originally presented for payment through the Federal Reserve on Thursday, July 2, 2009. Additionally, the four Bank of Evergreen checks deposited in the CB Account on July 2, 2009, (check nos. 2237, 2240, 2242, and 2243) were originally presented for payment through the Federal Reserve on Monday, July 6, 2009.

Bank of Evergreen dishonored the three June 30, 2009, checks on Monday, July 6, 2009, after it reopened following the Independence Day holiday. Community Bank received advance notification of the returned checks on the same day, and the Federal Reserve returned the check images to Community Bank on July 7, 2009. Bank of Evergreen dishonored the four July 2, 2009, checks on Tuesday, July 7, 2009. The Federal Reserve returned those check images to Community Bank on July 8, 2009.

Community Bank first realized that the Debtor was kiting checks on July 6, 2009, when it received notification that Bank of Evergreen was returning large items. As stated above, Community Bank had already granted the Debtor provisional credits for the uncollected deposits, which the Debtor withdrew by writing checks drawn on the CB Account. Therefore, Community Bank charged back each of the eighteen (18) checks to the Debtor's CB Account, and by July 9, 2009, the account was overdrawn by $6,155,070.68. Community Bank also returned nine (9) checks drawn on the CB Account and deposited into the BOE Account on July 6 and 7, 2009. The checks totaled $5,600,162.00. Bank of Evergreen had already placed five-day holds on the deposits, though, and the returned checks did not negatively impact Bank of Evergreen.

Community Bank filed late return claims with the Federal Reserve on the basis that Bank of Evergreen did not return the seven checks from June 30 and July 2 in a timely manner. If the returns were untimely, both Bank of Evergreen and the Debtor would be liable for paying the checks. Of course, Bank of Evergreen disputed the late return claims.

On Thursday, July 9, 2009, Sam Stinson, a principal of the Debtor; Darron Dodd, then president of Community Bank; Tim Dantz, a vice-president at Bank of Evergreen; and the president of the Bank of Evergreen met at the Bank of Evergreen in Evergreen, Alabama. The purpose of the meeting was to determine the cash position of the BOE Account, and they concluded that approximately $5.6 million would be available in the BOE Account. Sam Stinson and Leon Stinson, another principal of the Debtor, authorized Bank of Evergreen to wire transfer available funds to the CB Account.

The first hold on the BOE Account – regarding deposits totaling $3,296,600.00 – was scheduled to release on July 10, 2009, the day after the meeting.

At some point after the July 9 meeting, Bank of Evergreen determined that only $3,524,761.92 remained in the BOE Account. Bank of Evergreen agreed to process the proposed wire transfer on the condition that Community Bank execute an agreement releasing Bank of Evergreen from any liability arising out of Community Bank's late return claims. The effective date of the Settlement Agreement and Release of Claims was July 10, 2009. The agreement provided, in pertinent part:

1.   Community agrees as follows:

      (a) <u>Agreement Not to Return Checks</u>. Community agrees that it shall not return any checks drawn prior to July 10, 2009 on Community in respect of Stinson Petroleum and deposited to Accounts maintained at Evergreen except checks already returned . . . . The Account at Community is now restricted in anticipation of being closed, however the restriction herein shall not apply to checks drawn after July 1, 2009.

      (b) <u>Release of Disputed Claim</u>. Community agrees to drop any claim in respect of timeliness of return of checks in respect of the Accounts.

. . .

2.    Evergreen agrees as follows:

      (a) <u>Payment in Consideration of the Foregoing</u>. In consideration of the foregoing undertakings by Community, Evergreen agrees to immediately wire to Community the sum of Three Million Five Hundred Thousand and 00/100 Dollars ($3,500,000.00), deposited to the account of Stinson Petroleum to partially cover overdrafts, together with any other collected funds in excess of funds necessary to cover payroll, that may come into the Account through Tuesday, July 14, 2009, in excess all as previously authorized by Stinson Petroleum on July 9, 2009.

The Debtor did not sign the Settlement Agreement.

Sam Stinson and Leon Stinson retained $24,000.00 in the BOE Account to cover payroll expenses and executed written instructions to transfer $3.5 million from the BOE Account to the CB Account. The transfer was accomplished through two separate wire transfers. The first wire transfer, in the amount of $1,992,863.00, included the following notation in the written instructions: "payment for checks #2226, 2231 and 2229," which refers to the three checks from June 30, 2009, which Community Bank contested as having been returned untimely. The second wire transfer, in the amount of $1,507,137.00 included the following notation in the written instructions: "payment for returned checks."

7

After the wire transfers, the CB Account was left with a remaining overdraft of $3,993,053.00. Bank of Evergreen disputed Community Bank's late return claims, and the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on August 4, 2009.

The Trustee filed a Complaint seeking to avoid and recover the wire transfers as preferential transfers. The Bankruptcy Court held a trial on August 22, 2011, and it entered a Memorandum Opinion on September 14, 2011, holding that the wire transfers at issue were not avoidable preference transfers under 11 U.S.C. § 547. On the same day, the Bankruptcy Court entered a Final Judgment in accordance with the opinion. The Trustee filed a timely notice of appeal, and the matter is now ripe for review.

## II. STANDARD OF REVIEW

This Court reviews the Bankruptcy Court's conclusions of law *de novo*, while it reviews findings of fact for clear error. *In re Lothian Oil Inc.*, 650 F.3d 539, 542 (5th Cir. 2011). The Court reviews mixed questions of law and fact *de novo. In re San Patricio Cnty. Cmty. Action Agency*, 575 F.3d 553, 557 (5th Cir. 2010). While the determination of whether a transfer constitutes a preference is ultimately a question of law, the determination of a fact question underlying an element of the preference claim is subject to the clearly erroneous standard of review. *See In re Ramba, Inc.*, 416 F.3d 394, 402 (5th Cir. 2005) (the determination of whether a debtor retained possession of property – in which case the creditor would have had a statutory lien and, therefore, received the same amount in a Chapter 7 liquidation as in the alleged

8

preferential transfer – was a question of fact).

"A finding of fact is clearly erroneous only if on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed." *In re Duncan*, 562 F.3d 688, 694 (5th Cir. 2009) (punctuation omitted). If the Bankruptcy Court's view of the evidence "is plausible in light of the record viewed in its entirety," the Court "may not reverse it even though convinced that had it been sitting as a trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *In re Leonard*, 963 F.2d 809, 814 (5th Cir. 1992) (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573-74, 105 S. Ct. 1504, 1511, 84 L. Ed. 2d 518 (1985)). Therefore, the Court defers to the Bankruptcy Court's "determinations of witness credibility." *Duncan*, 562 F.3d at 695. Even if the Bankruptcy Court's "findings of fact do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts," the Court must employ the clearly erroneous standard. *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1308 (5th Cir. 1985).

### III. DISCUSSION

"Section 547(b) of the bankruptcy code allows a trustee to recover as a preferential payment certain transfers made by a debtor to a creditor within the ninety-day period prior to bankruptcy." *Braniff Airways, Inc. v. Exxon Co., U.S.A.*, 814 F.2d 1030, 1033 (5th Cir. 1987). Section 547(b) provides the elements of a preference:

(b) Except as provided in subsections (c) and (i) of this section, the

9

>   trustee may avoid any transfer of an interest of the debtor in property –
>
>   (1)   to or for the benefit of a creditor;
>
>   (2)   for or on account of an antecedent debt owed by the debtor before such transfer was made;
>
>   (3)   made while the debtor was insolvent;
>
>   (4)   made –
>
>       (A)   on or within 90 days before the date of the filing of the petition; or
>
>       (B)   between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
>   (5)   that enables such creditor to receive more than such creditor would receive if –
>
>       (A)   the case were a case under chapter 7 of this title;
>
>       (B)   the transfer had not been made; and
>
>       (C)   such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

The central dispute in this case involves the fifth element of a preference claim: "the requirement that before a trustee in bankruptcy can avoid a preferential payment, the trustee must establish that the payment enabled the creditor to receive more than the creditor would have received upon liquidation under Chapter 7 of the bankruptcy code." *Braniff*, 814 F.2d at 1034. To be clear, the Trustee had the burden to establish this element at trial. *Id.* at 1034 n. 3; *In re El Paso Refinery, L P*, 171 F.3d 249, 253

(5th Cir. 1999); 11 U.S.C. § 547(g). The Bankruptcy Court's task was "to construct a hypothetical Chapter 7 liquidation and determine what the creditor would have received had the transfers not taken place" – based on the evidence presented by the parties at trial. *In re N A Flash Foundation Inc.*, 298 F. App'x 355, 359 (5th Cir. 2008). When constructing a hypothetical Chapter 7 case, courts "assume that all persons would act in a commercially reasonable and businesslike manner." *Id.*

Of course, in determining whether a creditor received a greater percentage recovery on its debt than it would have in a Chapter 7 liquidation, courts must consider "how the debt would have been treated in a Chapter 7 liquidation." *Braniff*, 814 F.2d at 1034. The status of the creditor is pertinent to this determination, as "a fully secured creditor who receives a prepetition payment does not receive a greater percentage than he would have in a bankruptcy proceeding because as a fully secured creditor he would have recovered 100% payment in a bankruptcy proceeding." *El Paso Refinery*, 171 F.3d at 254. Therefore, "payments to a fully secured creditor are not preferential because the creditor does not receive more than he would in a Chapter 7 liquidation." *Braniff*, 814 F.2d at 1034.

Mississippi Code Section 75-4-210 provides:

(a) A collecting bank has a security interest in an item and any accompanying documents or the proceeds of either:

    (1) In case of an item deposited in an account, to the extent to which credit given for the item has been withdrawn or applied;

    (2) In case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given,

>> whether or not the credit is drawn upon or there is a right of charge-back; or
>
> (3) If it makes an advance on or against the item.
>
> . . .
>
> (c) Receipt by a collecting bank of a final settlement for an item is a realization on its security interest in the item, accompanying documents and proceeds. So long as the bank does not receive final settlement for the item or give up possession of the item or possession or control of the accompanying documents for purposes other than collection, the security interest continues to that extent and is subject to Title 75, Chapter 9, but:
>
> (1) No security agreement is necessary to make the security interest enforceable (Section 75-9-203(b)(3)(A));
>
> (2) No filing is required to perfect the security interest; and
>
> (3) The security interest has priority over conflicting perfected security interests in the item, accompanying documents, or proceeds.

MISS. CODE ANN. § 75-4-210. Therefore, once Community Bank provided provisional credit for the uncollected checks drawn on the Bank of Evergreen account, it received a perfected security interest in the kited checks. For this reason, the Bankruptcy Court held that the wire transfers "did not alter the position Community Bank would assume in a hypothetical chapter 7 case, and, accordingly, the fifth element of 11 U.S.C. § 547(b) cannot be met." *Stinson Petroleum Co.*, 2011 Bankr. LEXIS 3511 at *27 (citing *Braniff*, 814 F.2d at 1034).

This appeal reduces to a single factual dispute: whether Community Bank would have received less in a hypothetical Chapter 7 liquidation than it did pursuant to the Settlement Agreement. As noted above, the Bankruptcy Court held that Community

Bank would not have received less because of its perfected security interest in the returned checks. *Stinson Petroleum Co.*, 2011 Bankr. LEXIS 3511 at *27. Indeed, it is undisputed that Community Bank had a perfected security interest in the checks, and that "payments to a fully secured creditor are not preferential because the creditor does not receive more than he would in a Chapter 7 liquidation." *Braniff*, 814 F.2d at 1034.

Nonetheless, the Trustee argues that the Bankruptcy Court erred insofar as it failed to consider the practical difficulties that Community Bank would have faced in realizing its security interest in the kited checks without the Settlement Agreement.[2] The Trustee argues that Community Bank did not possess a blanket lien against the funds in the Debtor's BOE Account; rather, it only had the right to re-present the checks for payment in the ordinary course of business. In the meantime, the hold on the BOE Account was scheduled to lift on July 10, 2009. At that point, the Debtor and any other recipients of checks drawn on the account would have had access to the funds. Accordingly, the Trustee contends that it is highly unlikely Community Bank would have recovered anything in a Chapter 7 liquidation, as there was no guarantee that the funds would still be there by the time the Debtor filed its petition. According to the Trustee, Community Bank improved its position by executing the Settlement

---

[2]Community Bank argues that the Trustee failed to raise this "realization" argument before the Bankruptcy Court. The Court disagrees. The Trustee raised this issue in his opening statement before the Bankruptcy Court, noting that the security interested granted by Mississippi Code Section 75-4-210 was limited to the checks and did not create a blanket security interest in the debtor's property. Furthermore, the Trustee raised the issue in response to Community Bank's motion for summary judgment. *See Henderson v. Cmty. Bank*, No. 09-05094-NPO, 2011 Bankr. LEXIS 1421, at *35-*37 (Bankr. S.D. Miss. Apr. 12, 2011).

13

Agreement and ensuring that it would receive payment for some of the kited checks.

The Trustee had the burden of proving at trial that Community Bank would not have received at least $3.5 million dollars in a Chapter 7 liquidation, but the record contains scant evidence to that effect. As the Trustee noted in briefing, Community Bank senior vice-president Darron Dodd testified that there was no guarantee that Community Bank would have been paid on the checks without the Settlement Agreement. He stated, "It's possible. Maybe; maybe not." The Trustee further noted that the hold on the BOE Account was scheduled to lift on July 10, 2009, at which point the Debtor and other parties would have been able to draw on the BOE Account. In addition to these meager facts, the Trustee adds a number of assumptions. The Trustee assumes that Bank of Evergreen would not have honored the re-presented checks in the absence of the Settlement Agreement, and he also assumes that the funds in the BOE Account would have been depleted by the time the Debtor filed a petition. However, the Trustee failed to offer any evidence to support these assumptions.

In conclusion, the evidence presented at trial does not create a "definite and firm conviction" that the Bankruptcy Court was mistaken when it found that Community Bank would have received the full $3.5 million in the event of a hypothetical Chapter 7 liquidation. *Duncan*, 562 F.3d at 694. At best, the Trustee has proven that Mr. Dodd's evaluation was correct: that Community Bank may have been able to collect the $3.5 million, or it may not have been able to collect it. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Leonard*, 963 F.2d at 814. The Court affirms the decision of the Bankruptcy

Case 2:11-cv-00243-KS-MTP   Document 16   Filed 03/20/12   Page 15 of 15

Court.[3]

## IV. CONCLUSION

For the reasons stated above, the Court **affirms** the Memorandum Opinion and Final Judgment entered by the Bankruptcy Court on September 14, 2011, in this adversary proceeding. Accordingly, this case is dismissed.

SO ORDERED AND ADJUDGED this 20th day of March, 2012.

*s/Keith Starrett*
UNITED STATES DISTRICT JUDGE

---

[3]The parties spent an inordinate amount of briefing addressing factual issues and case law from outside this jurisdiction that are, at best, tangential to the main issue of whether Community Bank received more in the wire transfers than it would have in a Chapter 7 liquidation. These issues – such as whether Community Bank filed the late return claims in good faith, and whether the meeting and Settlement Agreement were extraordinary collection measures – are only weakly relevant to the central issue of whether Community Bank would have received at least $3.5 million in a hypothetical Chapter 7 liquidation. In any case, there is ample evidence in the record to support the Bankruptcy Court's factual findings with respect to those issues, and it is not necessary for the Court to specifically address them here.